IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF NEBRASKA

| | | |
|---|---|---|
| SANDRA E. PONCE, | ) | 4:10CV3188 |
| | ) | |
| Plaintiff, | ) | |
| v. | ) | MEMORANDUM |
| | ) | AND ORDER |
| MICHAEL J. ASTRUE, | ) | |
| Commissioner of the Social Security | ) | |
| Administration, | ) | |
| | ) | |
| Defendant. | ) | |

Plaintiff, Sandra E. Ponce, brings this suit challenging the Social Security Commissioner's final administrative decision denying her applications for disability insurance benefits ("DIB") and supplemental security income ("SSI") under Titles II and XVI of the Social Security Act, 42 U.S.C. §§ 401-434,1381-1383f.[1]  For the reasons discussed below, the Commissioner's decision will be reversed and the case will be remanded for further proceedings.

## I.  BACKGROUND

Plaintiff's applications for DIB and SSI were denied initially on September 10, 2007 (Tr. 82-85), and on reconsideration on February 7, 2008 (Tr. 91-94). Plaintiff requested a hearing before an administration law judge ("ALJ"), which was held on October 7, 2009 (Tr. 36, 103). Testifying at the hearing were Plaintiff, a social worker (Sue Bowen), and a vocational expert ("VE"). On November 30, 2009, the ALJ issued a unfavorable decision (Tr. 9-35).

---

[1] Sections 205(g) and 1631(c)(3) of the Act, 42 U.S.C. §§ 405(g), 1383(c)(3), provide for judicial review of the Commissioner's final administrative decisions under Titles II and XVI.

The ALJ found Plaintiff has severe, medically determinable impairments that include bipolar disorder, obesity, asthma, and diabetes mellitus (Tr. 14-17). He determined that she has the residual functional capacity ("RFC") to perform medium exertional work, but is limited to performing simple, repetitive tasks (Tr. 21-29). He found that Plaintiff's impairments would allow her to perform past relevant work as a sales attendant, highway maintenance flagger, and pizza delivery person (Tr. 29-30), and that therefore she is not under a "disability" as defined in the Act (Tr. 30).

On February 3, 2010, Plaintiff requested review of the ALJ's decision by the Appeals Council (Tr.6-7). The request for review was denied on July 29, 2010 (Tr. 1-5), and this action followed.

### A. The ALJ's Findings

The ALJ evaluated Plaintiff's claim according to the 5-step sequential analysis prescribed by the Social Security Regulations[2] and made these findings:

> 1. The claimant meets the insured status requirements of the Social Security Act through December 31, 2007.

---

[2] "At the first step, the claimant must establish that he has not engaged in substantial gainful activity. The second step requires that the claimant prove he has a severe impairment that significantly limits his physical or mental ability to perform basic work activities. If, at the third step, the claimant shows that his impairment meets or equals a presumptively disabling impairment listed in the regulations, the analysis stops and the claimant is automatically found disabled and is entitled to benefits. If the claimant cannot carry this burden, however, step four requires that the claimant prove he lacks the [residual functional capacity ('RFC')] to perform his past relevant work. Finally, if the claimant establishes that he cannot perform his past relevant work, the burden shifts to the Commissioner at the fifth step to prove that there are other jobs in the national economy that the claimant can perform." *Gonzales v. Barnhart*, 465 F.3d 890, 894 (8th Cir. 2006) (footnote omitted).

2. The claimant has not engaged in substantial gainful activity since May 4, 2007, the alleged onset date (20 CFR 404.1571 *et seq.*, and 416.971 *et seq.*).

3. The claimant has the following severe[3] impairments: bipolar disorder, obesity, asthma, and diabetes mellitus (20 CFR 404.1520(c) and 416.920(c)).[4]

4. The claimant does not have an impairment or combination of impairments that meets or medically equals one of the listed impairments in 20 CFR Part 404, Subpart P, Appendix 1 (20 CFR 404.1520(d), 404.1525, 404.1526, 416.920(d), 416.925 and 416.926).

5. After careful consideration of the entire record, the undersigned finds that the claimant has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c) except she is limited to simple repetitive tasks; she can maintain concentration, attention, persistence and pace; she can interact with and relate to others; she can adapt to usual changes in the work setting; and she can adhere to safety rules.

6. The claimant is capable of performing past relevant work as the sales attendant job, as described and as performed. The claimant further can perform the pizza delivery person, and highway maintenance-flagger jobs as performed. This work does not require the performance of

---

[3] A medically determinable impairment is "severe" if it significantly limits an individual's physical or mental ability to do basic work activities. *See* 20 C.F.R. §§ 404.1521, 416.921.

[4] The ALJ also stated that Plaintiff "has alleged a number of impairments which are determined to be non-severe: fibromyalgia, low back pain, hip pain, hip degeneration, and sleeping disorders. There is a single hip x-ray in the exhibit file, which was normal. Range of motion, straight leg raising (SLR) and other objective testing, done by the claimant's treating sources, also were all normal. There has been no positive trigger point testing results, no evidence of edema, and no extremity pain or tenderness on palpitation." (Tr. 19) Plaintiff does not challenge these findings.

work-related activities precluded by the claimant's residual functional capacity (20 CFR 404.1565 and 416.965).

7. The claimant has not been under a disability, as defined in the Social Security Act, from May 4, 2007 through the date of this decision (20 CFR 404.1520(1) and 416.920(1)).

(Tr. 14-30)

### B.  Statement of Issues

Plaintiff contends the ALJ committed reversible error by failing to include all of her mental limitations in the RFC assessment.[5]

### C. Statement of Facts

Plaintiff was 48 years old on May 4, 2007 when her disability allegedly began (Tr. 130). She earned a high school equivalency degree (Tr. 40) and has worked at a variety of jobs (Tr. 177).  Her annual earnings have not exceeded $3,000.00 since 2001 (Tr. 142).[6]

---

[5] In her reply brief, Plaintiff denies "rais[ing] the issue of the ALJ's credibility findings"(filing 25 at 1) in connection with the RFC assessment.  Plaintiff does raise a second issue in her initial brief as to whether a hypothetical question the ALJ posed to the VE "failed to include all of the mental limitations supported by the record" (filing 17 at 18), but this issue is indistinguishable from the issue stated regarding the RFC assessment.  "To constitute substantial evidence, a hypothetical must set forth the impairments accepted as true by the ALJ." _Brachtel v. Apfel_,132 F.3d 417, 421 (8th Cir. 1997). Thus, for example, "when an ALJ states that a claimant has impairments of concentration, persistence, or pace, the hypothetical must include those impairments." _Id._ (citing _Newton v. Chater_, 92 F.3d 688, 695 (8th Cir. 1996)).

[6] Plaintiff filed earlier disability claims, the most recent of which was denied in a May 3, 2007 decision (Tr. 77, 149-51). Because the file does not contain a copy of the prior decision, the ALJ ruled that _res judicata_ is inapplicable (Tr. 14).

-4-

Plaintiff indicated in a disability report submitted with her application that her impairments included "Bipolar, Anxiety, Mood disorder, Anger control problem, Fibromyalgia of entire body, Carpal tunnel, Leg, Shoulder, and Hip problems, mostly on right side" (Tr. 175). She explained that these impairments limited her ability to work, as follows:

> A lot of time I have to be able to sit down because I have sat to long. If i have been up to long I have to sit down. I lose feelings in my legs and I fall down. I have no grip strength in my hands. I cannot even grip the dishes to wash them. I try to find jobs that accomadate the injuries that I have where I can sit or stand as needed and I don't have to use my hands. I have an anger control problem, I space out a lot and have a short attention span, poor short term memory. If i get interupted during a sentence I forget what I was talking about and cannot go back. I am always going a hundred miles per hour and I either end up quitting my job or getting fired because i try to go from step 1 to step 10 and i skip the rest of the steps in between. I get a throbbing pain in my right rear and then my right leg will go numb and I can fall.

(Tr. 176 (as per typed original))  Her listed medications were Lithium and Zyprexa (Tr. 180).  The interviewer at the Social Security field office noted that Plaintiff had difficulty concentrating and "was going a hunderd [sic] miles an hour and would start talking about something and that would lead to the next and would have to interrupt to get her back on track" (Tr. 173).  He observed no other limitations (Tr. 173).  In subsequent disability reports, Plaintiff indicated that beginning in August 2007 she was experiencing "diabetes more pain" and "burning, tingling in my feet" (Tr. 155), and that beginning in January 2008 "i can t stand longer than 5 minutes, cant sit longer than 10 min, nao feeling in my fingertips, no grip strength, cant concentrate . . . i cant squat, difficulty walking, cant hold or carry anything heavier than 5lbs" (Tr. 165 (as per typed original)).  Plaintiff stated that the only medications she was taking were Lithium and Wellbutrin (Tr. 157, 166).

On January 18, 2007, Plaintiff was seen by Kim Baker, APRN, at Mid-Plains Center for Behavioral Health for medication management (Tr. 273).  Ms. Baker, who

had been providing mental health treatment to Plaintiff since June 2006 (Tr. 276-291), diagnosed her with "Bipolar I, most current episode mania"; "Alcohol Dependence, in full remission"; and Cocaine Dependence, in full remission" (Tr. 285) Plaintiff reported that she had been sleeping poorly and did not think her medication was working very well (Tr. 273). Her mood was "somewhat excitable, but cooperative and agreeable," her thought content "was logical and clear," and "her intellect, memory, insight and judgment [were] all good" (Tr. 274). Plaintiff was instructed to continue taking "Lithium 300 mgs., 2 in the a.m., 2 in the p.m.," and was prescribed Lunesta to help her sleep (Tr. 272). It was noted that Plaintiff was living alone in an apartment she "received through Goodwill Housing" and was "attend[ing] Goodwill services and was a Goodwill referral" (Tr. 273).

Plaintiff attended 17 days of "day rehab" at Goodwill Industries in January 2007 where she participated in group and other activities (Tr. 258). JoAnn Sukovaty, a Goodwill "day rehab specialist," noted that Plaintiff "has been on a manic high and is having a difficult time being able to sleep" (Tr. 258). Plaintiff was "encouraged . . . to continue to talk to Mid-Plains on a consistent basis and work with them so they can get her meds adjusted" (Tr. 258). Plaintiff's performance compared to other participants was rated as "marginal" in most categories (Tr. 258). Ms. Sukovaty assigned plaintiff a global assessment of functioning ("GAF") score of 50.[7]

Plaintiff attended 10 days of day rehab in February 2007, and her performance was generally rated as "unsatisfactory" or "marginal" (Tr. 251). A Goodwill "community support worker," C. Lopez, made this notation on February 7: "At this time consumer still continues to struggle physically and mentally. They seem to not

---

[7] The *Diagnostic and Statistical Manual of Mental Disorders*, Fourth Edition, Text Revision (*DSM-IV-TR*) states that the GAF scale is used to report the clinician's opinion as to an individual's level of functioning with regard to psychological, social, and occupational functioning. *See DSM-IV-TR* 32 (4th ed. 2000). A GAF score of 41 to 50 indicates serious symptoms or serious impairment in social, occupational, or school functioning. *See id.* at 34.

be able to get her adjusted on the right medication for her psyche meds. Consumer at this time continues to not feel well. Her back and her hands seem to always be hurting. Her hands swell up at times where she's unable to hold anything. She has no strength and sometimes drops things. Her back continues to hurt quite a lot since the accident.[8] She is not physically well." (Tr. 252) Ms. Sukovaty again assigned Plaintiff a GAF score of 50 (Tr. 251).

On February 7, 2007, Plaintiff presented to the emergency room at St. Francis Medical Center, alleging shortness of breath and fluid retention, which had been ongoing for a month (Tr. 316). Her behavior was described as "agitated and angry, yelling at staff" (Tr. 316) It was noted that she has "underlying bipolar mood disorders as well as asthma," and that she continues to smoke (Tr. 316). Lab results showed her Lithium level was 1.4, which was therapeutic (Tr. 316). Her respiratory exam was essentially normal, with "maybe a rare wheeze" (Tr. 316).

Plaintiff saw Ms. Baker again on February 26, 2007, for a medication check (Tr. 269).  Plaintiff reported that "the Lithium is holding her manic phase and doing well for her" and that "she has been sleeping well and her mood is stable" (Tr. 269). Ms. Baker prescribed "Lithium 300 mgs., 2 in the morning, and 3 in the afternoon," and "[n]o other medication at this time" (Tr. 270).

When Plaintiff next visited Ms. Baker on March 7, 2007, Navdeep Sood, M.D. was also present (Tr. 271). Plaintiff complained of sleeping poorly and indicated that she was distressed because of recent murders that had taken place in a home where her son was living (Tr. 271).  Plaintiff stated that "otherwise her mood had been stable" (Tr. 271). Plaintiff's Lithium level was found to be low and not therapeutic (Tr. 271). Her medication was changed to "Eskalith CR 450 mgs., 2 in the morning and 2 in the evening," and she was also given Zyprexa to take as needed for sleep (Tr. 272).

---

[8] According to one medical report, Plaintiff was involved in a car accident in 2003 (Tr. 350).

Plaintiff attended 13 days of day rehab in March 2007 and generally received "marginal" ratings (Tr. 241). The day rehab specialist noted that Plaintiff had not been reading her pill bottles and was taking the wrong dosage of Lithium (Tr. 241). She assigned Plaintiff a GAF score of 45 (Tr. 241).

On April 17, 2007, Plaintiff told Ms. Baker that "the Eskalith has been helpful" and that "she has not had a manic phase or hypomanic phase [f]or over a month" (Tr. 267). She reported, however, that "she had misread the bottle and is taking 3 in the morning and 3 in the afternoon, which caused her to have tremors" (Tr. 267). Ms. Baker noted that Plaintiff was alert and oriented, with normal mood, memory, judgment, and insight (Tr. 268).

Plaintiff attended 9 days of day rehab in April 2007 and again received "marginal" or "unsatisfactory" ratings (Tr. 235). It was noted that Plaintiff "has had a hard time managing her stress" and that therapy was recommended (Tr. 235). The day rehab specialist again assigned Plaintiff a GAF score of 45 (Tr. 235).

Plaintiff attended 12 days of day rehab in May 2007 and generally received "marginal" ratings (Tr. 228). Plaintiff stated on May 14 that she "watched her grandbaby for two weeks this month while the mom was out of town" and that "she was not taking her meds as prescribed" (Tr. 228, 230). She reported on May 18 that she was now being compliant with taking her medication (Tr. 230). Ms. Sukovaty raised Plaintiff's GAF score to 50 (Tr. 228).

On June 18, 2007, Plaintiff told Ms. Baker that "she has been meaning to see Mark [Nelson] for counsel," that "she continues to go to Goodwill and it continues to be helpful," and that "[s]he believes medication is effective" (Tr. 372). Her Lithium level was 1.31, which was just above the therapeutic range (Tr. 372). Ms. Baker again noted normal mental status findings (Tr. 373).

-8-

Plaintiff's Goodwill case manager, Sue Bowen, SACSW, completed an information form on June 26, 2007 (Tr. 183-85). Ms. Bowen explained that she had known Plaintiff for six months and that she saw or talked with Plaintiff weekly (Tr. 183). She reported that Plaintiff "is aggressive toward others," "[d]isplays manic symptoms, wants her demands met immediately, [is] argumentative," and has "[d]ifficulty with comprehension" (Tr. 184). She also reported that Plaintiff "is easily agitated, verbally aggressive" in a stressful situation and is "unable to deal with criticism" (Tr. 184). In response to how well Plaintiff responds to supervision, Ms. Bowen, wrote: "NO. Client is easily agitated, verbally aggressive, little or no insight into her behavior." (Tr. 184) She stated that Plaintiff "gets angry when her routine is altered" (Tr. 184). In response to a question about whether Plaintiff is able to concentrate and maintain attention, Ms. Bowen responded: "NO. Mind racing, can't focus, difficulty comprehending what she is reading." (Tr. 185) In particular, it was noted that Plaintiff "has difficulty reading [medication] labels, needs frequent clarification" (Tr. 184). Under additional remarks, Ms. Bowen wrote: "Client cannot focus on tasks, racing thoughts interfere with learning new tasks, easily agitated becomes aggressive (verbally), easily frustrated." (Tr. 185) She further reported that Plaintiff's "[b]ody movements are stilted," "[b]oth hands shake," and she "[c]omplains of constant back & hip pain." (Tr. 185) She stated, however, that Plaintiff prepares her own meals, shops for groceries, does laundry, visits friends and relatives daily, goes for walks, cares for her grandchildren, watches TV, attends socialization activities, and exhibits good grooming (Tr. 183-85).

In a daily activities report completed on July 5, 2007, Plaintiff stated that she traveled by bus to Goodwill classes five days a week, and she walked daily (Tr. 199). She did housework, went grocery shopping with her daughter, and visited a neighbor (Tr. 200). She lived alone and was able to prepare her own meals and do household chores, such as laundry, washing dishes, vacuuming, and cleaning the bathroom (Tr. 200). She did not drive because her car needed repairs (Tr. 200). She was able to handle her own money (Tr. 200). Because of stiffness in her hands and her fingers "locking up," her hobbies were limited to playing cards (Tr. 200). She reported

"difficulty sleeping - short sleep periods, trouble falling asleep" (Tr. 200). Plaintiff described her symptoms as "pain, anxiety, mania, agitation, feeling overwhelmed, memory loss, can't focus or concentrate" (Tr. 201). She stated that her "whole body feels on fire" and she feels "spacey" (Tr. 201) Her listed medications consisted of Lithium and over-the-counter ibuprofen (Tr. 202). She indicated that the Lithium provided "some help" for her mental illness but that she got no relief from her physical pain (Tr. 202).

When seen by Ms. Baker on July 9, 2007, Plaintiff was tearful through much of the meeting and explained that she was troubled because one son was recently arrested for robbery and burglary and another son was facing similar charges (Tr. 370-371).  Medications were not changed (Tr. 371).

On July 30, 2007, Plaintiff again was tearful when she saw Ms. Baker, stating that her daughter had been indicted on drug charges and that her two sons remained incarcerated (Tr. 368).  She also said she was going to see Mark Nelson the following day for therapy (Tr. 368).[9]

A state agency psychologist, Linda Schmechel, Ph.D., completed a mental residual functional capacity assessment form on August 1, 2007 (Tr. 332-35). She found Plaintiff was moderately limited in the ability to understand and remember detailed instructions; the ability to carry out detailed instructions; the ability to maintain attention and concentration for extended periods; the ability to perform activities within a schedule, maintain regular attendance, and be punctual within customary tolerances; the ability to complete a normal workday and workweek without interruptions from psychologically based symptoms and to perform at a consistent pace without an unreasonable number and length of rest periods; the ability to interact with the general public; the ability to accept instructions and respond

---

[9] Notes from Plaintiff's therapy sessions with Mr. Nelson do not appear in the medical records provided by Mid-Plains Center, nor are his credentials known.

appropriately to criticism from supervisors; the ability to get along with coworkers or peers without distracting them or exhibiting behavioral extremes; and the ability to set realistic goals or make plans independently of others (Tr. 332-333). Dr. Schmechel also completed a psychiatric review technique form, in which she found that Plaintiff experiences mild restrictions in activities of daily living; moderate difficulties in maintaining social functioning; moderate difficulties in maintaining concentration, persistence or pace; and no repeated episodes of decompensation, each of extended duration (Tr. 346).[10]

On August 16, 2007, Plaintiff returned to Mid-Plains for medication management. She told Ms. Baker, "I am feeling better and things are settling down with my children at home." (Tr. 366) She stated that "her sleep is well, except that she does watch her grandson and he keeps her up at night . . .." (Tr. 366) Plaintiff indicated that "she still has some depression, but she contributes [sic] this to many of life's stressors surrounding her children" (Tr. 366). Ms. Baker described Plaintiff's mood as "stable" and her thought, memory, judgment, and insight as "good" (Tr. 367).

---

[10] "Activities of daily living include adaptive activities such as cleaning, shopping, cooking, taking public transportation, paying bills, maintaining a residence, caring appropriately for [the claimant's] grooming and hygiene, using telephones and directories, and using a post office. 20 C.F.R. pt. 404, subpt. P., App. 1 § 12.00C. "Social functioning refers to [the claimant's] capacity to interact independently, appropriately, effectively, and on a sustained basis with other individuals." _Id._ "Concentration, persistence, or pace refers to the ability to sustain focused attention and concentration sufficiently long to permit the timely and appropriate completion of tasks commonly found in work settings." _Id._ "Episodes of decompensation are exacerbations or temporary increases in symptoms or signs accompanied by a loss of adaptive functioning, as manifested by difficulties in performing activities of daily living, maintaining social relationships, or maintaining concentration, persistence, or pace." _Id._ "The term repeated episodes of decompensation, each of extended duration in these listings means three episodes within 1 year, or an average of once every 4 months, each lasting for at least 2 weeks." _Id._

She prescribed "Eskalith CR 450 mgs., 2 b.i.d.," "Zyprexa Zydis 20 mgs, p.r.n. for sleep," and "Wellbutrin XL 150 mgs., for depression" (Tr. 367).

On August 24, 2007, Plaintiff cooperated with a consulting evaluation by Mark Jobman, M.D. (Tr. 350-353) Plaintiff provided the following history:

> She states she has been unable to work since 2003 for a variety of reasons. She has pain all across her low back. She had an accident in 2003. She was driving her car to Omaha, was in a snow storm apparently and was hit from behind by a semi and has had pain in her L low back since that time. She states she has had pain in her R low back longer than that. She had fallen when she worked for Conagra doing meat packing. She does not really have pain that goes into her legs. She has a burning feeling in her low back rather than a sharp or aching pain. The discomfort is worse when she has been up on her feet for even a short time. She also has numbness in both hands. She states she has been told she has carpal tunnel syndrome based on testing, but has not had surgery partly because she cannot now afford it. She states that she can not feel touch on her hands. She drops things. She drops dishes. Has broken quite a few dishes that way. She denies being able to feel any significant sensation in both hands. Both the palm side and the extensor side. She has also had surgery on both shoulders, apparently an arthroscopic type procedure. She says they are fine now. She also has bipolar depression. She is on medication for that. Still has difficulty sleeping, poor energy, poor appetite, trouble concentrating. Tends not to do much if she doesn't have anything that she has to do. Is not suicidal, but she admits she gets quite moody and has threatened to kill people before when she is upset.

(Tr. 350) Plaintiff told Dr. Jobman that she can walk 3-4 blocks and stand about 15 minutes (Tr. 350). On examination, Plaintiff got up slowly and moved with apparent stiffness, but there was no joint deformity, tenderness, swelling, or effusion; she had nearly full range of motion. (Tr. 351) Sensation was significantly decreased in her hands, but Plaintiff could pick up a paperclip and a penny off the desk (Tr. 351). Dr. Jobman opined that Plaintiff would have difficulty with repeated hand work or frequent bending and lifting, and also stated that "[t]he bipolar disorder is going to

-12-

make it difficult for her to tolerate any position where there is significant stress" (Tr. 351).[11]

On September 5, 2007, a state agency consulting physician assessed the claimant as limited to medium exertion work, with no postural or manipulative restrictions (Tr. 354-62). This physical RFC assessment was affirmed by another physician on January 31, 2008 (Tr. 379-80).

On September 26, 2007, Plaintiff returned to Mid-Plains Center for medication management and was seen by Linda Berry, APRN (Tr. 525). Plaintiff stated she had not slept for 3 days and was feeling paranoid about everything (Tr. 525). Ms. Berry noted that Plaintiff's mood was agitated, but her thought content was logical and clear and her intellect, memory, judgment, and insight all appeared to be intact (Tr. 526). Her medications were not changed (Tr. 526).

On November 13, 2007, Plaintiff was seen by Navdeep Sood, M.D., at Mid-Plains Center (Tr. 523-24). Plaintiff reported having racing thoughts and trouble falling asleep at night (Tr. 523). Dr. Sood noted that her affect was appropriate, her mood was euthymic, and her speech was fluent and "hyper-verbal" (Tr. 524). He thought Plaintiff demonstrated good insight, judgment, and memory, but had "some problems" with concentration (Tr. 524). Dr. Sood prescribed Eskalith, 900 mg. twice a day, and Wellbutrin XL, 300 mg. (Tr. 524).

---

[11] The ALJ stated that he "has considered Dr. Jobman's assessment, but is unable to give it controlling weight. The evaluation report does not identify Dr. Jobman as qualified in psychiatry or psychology and therefore, his medical expertise does not permit a diagnostic assessment of the claimant's allegedly severe mental health impairments. Additionally, since there was no indication of musculoskeletal pain on exam, and since the claimant had nearly full range of motion, there is no objective evidence to support a postural restriction based on alleged back pain." (Tr. 28) Plaintiff does not dispute this determination.

On December 13, 2007, Plaintiff completed another daily activities report (Tr. 211-15). She stated that she attended Goodwill classes for six hours daily but otherwise isolated herself in her home because she had no money (Tr. 211-12).

Sue Bowen also completed another information form on December 10, 2007 (Tr.208-210). She indicated that Plaintiff interacts with people in social activities "fairly well" but becomes anxious in a stressful situation and cannot deal with criticism (Tr. 209). Regarding whether Plaintiff responds well to supervision, she wrote: "No. She becomes very defensive & angry unless instruction is present[ed] tactfully" (Tr. 209). Regarding whether Plaintiff adjusts to changes, she wrote: "No, does not handle changes in routine well, causes confusion & anger" (Tr. 209). Regarding whether Plaintiff is able to concentrate and maintain attention, she wrote: "No. Memory is poor, doesn't seem to comprehend" (Tr. 210).

Plaintiff saw Ms. Berry again on January 8, 2008 (Tr. 436). Plaintiff was upset because she thought she would be seeing Dr. Sood (Tr. 436). She reported mania, paranoia, and difficulty sleeping (Tr. 436-37). She stated that three of her children remained incarcerated and two daughters were pregnant (Tr. 436). Ms. Berry advised Plaintiff to taper off her use of Wellbutrin and to use her prescription sleep aid when needed (Tr. 437).  She also prescribed "Lithium Carbonate 450 mgs., po [by mouth] a.m., 1350 mgs., po at h.s. [at bedtime]" (Tr. 437).

On January 31, 2008, Ms. Berry assessed that Plaintiff continued to undergo mania and she noted: "The client is pressured. She is euphoric. She demonstrates underlying agitation." (Tr. 434).  Plaintiff asked to resume taking Wellbutrin because she noted increased cravings for food and was smoking more heavily; Ms. Berry complied (Tr. 434-35).  She also reduced the Lithium Carbonate dosage to "450 mgs., 1 tab po a.m., 2 tabs po h.s." because of an elevated Lithium level and increased the Zyprexa dosage (Tr. 435).

-14-

On February 6, 2008, Plaintiff returned to Mid-Plains Center for a medication check (Tr. 432-33). She stated she was feeling better, was eating and smoking less by being back on Wellbutrin, and was sleeping better with her increased Zyprexa dosage (Tr. 432). Ms. Berry assessed decreased signs of mania (Tr. 435).

On March 11, 2008, Plaintiff reported discontinuing Wellbutrin on her own because she did not think it was impacting her appetite or urge to smoke (Tr. 430). Plaintiff said she still had mood swings, with periods of irritability, racing thoughts, and agitation (Tr. 430). She said her attendance at Goodwill had not been good (Tr. 430). She was sleeping in excess, 12 hours per night (Tr. 430). Plaintiff also reported self-decreasing Zyprexa, because she was getting some leg restlessness (Tr. 430). She complained of "borderline diabetes" and said she had gained weight which was making her asthma worse (Tr. 430-31). Ms. Berry told Plaintiff to wean herself off of Zyprexa and discussed starting her on Topamax (Tr. 431). It was decided that Ms. Berry would review Plaintiff's medications with Dr. Sood (Tr. 431).

On March 31, 2008, Plaintiff reported feeling better, with less agitation (Tr. 428). Plaintiff stated she was active in caring for her grandson, who had significant behavioral problems (Tr. 428). Ms. Berry noted Plaintiff appeared to have "derived benefit from the addition of Trileptal, with noted decrease in pressure of speech, as well as decrease in agitation." (Tr. 429)

On April 24, 2008, Ms. Berry noted that Plaintiff was upset about events at Goodwill the day before, where she was asked to sit at a different table for the noon meal and did not want to change and refused to do so (Tr. 426). Ms. Berry also noted that Plaintiff's speech was somewhat pressured, but that "[s]he does remain somewhat calmer than has been noted prior to the initiation of the Trileptal" (Tr. 426-27).

On May 29, 2008, Ms. Berry noted Plaintiff was euphoric, her speech was somewhat pressured, and she was fidgeting (Tr. 424). The Trileptal dosage was increased (Tr. 424-25).

-15-

On July 1, 2008, Plaintiff reported that she would be caring for her newborn grandson when her daughter went to prison the following month (Tr. 422). Sue Bowen, who accompanied Plaintiff to Mid-Plains Center, reported that Plaintiff continued to be manic (Tr. 422). Plaintiff volunteered that she had run out of Lithium 4 or 5 days ago (Tr. 422). Ms. Berry noted that Plaintiff's mood was euphoric and her speech was pressured (Tr. 423). She did not adjust the medications (Tr. 423).

On July 29, 2008, Plaintiff reported to Ms. Berry that "her mood has been good" (Tr. 421). Ms. Bowen "also viewed the patient as doing well" (Tr. 421).

On August 18, 2008, Ms. Berry noted that Plaintiff had called her the previous week reporting mania, particularly irritability (Tr. 419). Her last Lithium level showed she was sub-therapeutic, so the dosage was increased (Tr. 419). Plaintiff reported that her sleep had been adequate but that she had been irritable to Goodwill staff (Tr. 419). Ms. Berry noted that Plaintiff was pleasant and cooperative for the visit but "has demonstrated some euphoria" (Tr. 420).

On October 22, 2008, Plaintiff reported that she had discontinued the Lithium because she felt it was causing her to cry, as well as causing her to feel anxious and have panic episodes (Tr. 417). She reported she had been tearful for several weeks over small matters (Tr. 417). Plaintiff said she had significant stressors at home, and was tending to her 2 small grandchildren who had been placed with her by Social Services when the mother went to prison (Tr. 417). Ms. Bowen reported she "has seen increased agitation with the patient" (Tr. 418). Ms. Berry noted that Plaintiff's speech was pressured and her mood was slightly euphoric (Tr. 418). She continued the Trileptal and started Plaintiff on "Neurontin 300 mgs., b.i.d. x 1 week, then Neurontin 300 mgs. a.m., 600 mgs. At h.s." (Tr. 418).

On November 7, 2008, Dr. Sood and Mark Nelson both signed a mental impairment evaluation form (Tr. 399-405). The diagnosis was bipolar disorder, with an onset date of over 10 years earlier (Tr. 399). Plaintiff's history was significant for

-16-

incarceration, homelessness, and multiple prior hospitalizations for mental illness (Tr. 400). Dr. Sood and Mr. Nelson stated that Plaintiff's condition had improved with medication and therapy since she began treatment in 2006, but her prognosis was poor (Tr. 400). They cited panic attacks, chronic agitation, marked irritability, depression, lack of hope, helplessness, physical aggression, chronic mood instability, severe impairment of judgment and insight, and poor ability to make decisions (Tr. 401). They opined that the performance of Plaintiff's former job or other similar work could have an adverse effect on her impairment; stating, "Stress of employment aggravates Mood d/o and will cause greater decompensation and increase mood and behavior abnormalities, such as extreme anger, verbal abuse, mind-racing and physical acting out" (Tr. 399). They also opined that claimant's condition constantly interferes with attention and concentration (Tr. 400). They did not consider Plaintiff a malingerer (Tr. 400). Dr. Sood and Mr. Nelson also completed a mental capacities evaluation form in which they indicated that Plaintiff was "markedly limited" (*i.e.*, occurring twice or more per week) in all 20 functional categories listed (Tr. 402-04). They opined that because of these limitations Plaintiff's maximum workday would be less than 3 hours and she could only work "0-3 days per week" (Tr. 403). They indicated that Plaintiff's functional limitations were not the result of the effect of drug or alcohol addiction (Tr. 404).

On November 20, 2008, Plaintiff continued to be hypomanic (Tr. 416). Her case manager "expressed concern for the patient's current flamboyant fashion" and reported that "[s]he can easily escalate in regard to becoming loud and talkative, particularly while in groups" (Tr. 415). Plaintiff reported that her thought racing had improved and she did not wish to return to Lithium, even though both Ms. Berry and Ms. Bowen advised her that she was less manic while taking Lithium (Tr. 415). Ms. Berry increased the Trileptal dosage to 600 mgs. twice a day (Tr. 416).

Plaintiff saw Ms. Berry on December 15, 2008, for an emergency visit after she reported that she had reduced her Trileptal dose because it was "making her high" (Tr. 413). She admitted to thought racing, primarily during the daytime hours, and to

having spending sprees (Tr. 413). She again refused to return to Lithium (Tr. 414). Ms. Berry discontinued the Trileptal and prescribed Invega (Tr. 414).

Plaintiff saw Carrie Sheldon, M.S., with Family Resources of Greater Nebraska on January 6, 2009 (Tr. 464). Plaintiff explained that she had been seeing Mark Nelson at Mid-Plains Center, but switched to Ms. Sheldon because she did not want to discuss sexual abuse with a man and this was now an issue that was coming up in connection with a teenage grandson's placement in a treatment group home (Tr. 465). Her diagnosis was bipolar II disorder, with a GAF score of 51-60 (Tr. 466).[12] Ms. Sheldon referred Plaintiff to Susan Lindblad, Ph.D., for a mental status examination to aid in differential diagnosis and in treatment planning (Tr. 463). Plaintiff was scheduled for weekly therapy sessions (Tr. 466).

Dr. Lindblad examined Plaintiff on January 14, 2009 (Tr. 463). Plaintiff said she had not worked since 2003, when she was in a car accident (Tr. 463). She stated that her depression was not as bad as it had been years before (Tr. 463). She stated that she struggled with paranoia, which stemmed from her family members' history of involvement in criminal activities (Tr. 463). She also complained of mood swings and stated that sleeping could be very difficult, especially with a baby at home (Tr. 463). Dr. Lindblad made the following observations: "She is alert and oriented to person, place and time.  Language is normal in tone and articulation with goods levels of productivity.  Thought processes are clear and coherent with no evidence of delusions, hallucinations, blocking or other psychotic thought processes.  She appears to have average levels of intelligence." (Tr. 463) Dr. Lindblad assessed a GAF score of 55 (Tr. 463). She recommended that Plaintiff continue outpatient therapy, and she stated that her prognosis was "fairly good secondary to her motivation level and interest in improvement" (Tr. 463).

---

[12] A GAF score of 51 to 60 indicates moderate symptoms or moderate difficulty in social, occupational, or school functioning. *See DSM-IV-TR* 34 (4th ed. 2000).

Plaintiff also saw Ms. Sheldon on January 14, 2009, and reported having difficulty concentrating on one thought because other thoughts interfered (Tr. 469) Ms. Sheldon noted that Plaintiff's "high energy level is reflected in increased motor activity, restlessness and agitation" (Tr. 469).

On January 21, 2009, Ms. Sheldon noted that Plaintiff "gave evidence of a very expansive mood that can easily turn to impatience and irritability if her behavior is blocked or confronted" (Tr. 469). She also noted that Plaintiff was teary eyed in the session and reported sad feelings (Tr. 470). Plaintiff said she was having flashbacks to the 2003 accident and having reactions to her medication (Tr. 469-70).

On January 28, 2009, Plaintiff again reported that she was having difficulty concentrating but Ms. Sheldon judged that she was "significantly improved and capable of participating in psychotherapy" (Tr. 470). Plaintiff also "reported that the medication has been effective at reducing energy levels, flight of ideas, and the decreased need for sleep," but said "she is not happy with [it] because of the side effects" (Tr.470).

On February 11, 2009, Ms. Sheldon noted that Plaintiff's attention shifted quickly from one stimulus to the next (Tr. 470). Plaintiff's compliance with her psychotropic medication prescription was reviewed (Tr. 470).

On February 18, 2009, Ms. Sheldon noted Plaintiff gave evidence of a short attention span and a high level of distractibility; she also gave evidence of a very expansive mood that can easily turn to impatience and irritability if her behavior is blocked or confronted (Tr. 470-71). Plaintiff reported that she has continued racing thoughts (Tr. 471). Ms. Sheldon assessed a GAF score of 50-55. (Tr. 471)

On February 19, 2009, Plaintiff returned to Mid-Plains Center for a medication check (Tr. 411-12). She complained of tearfulness, sadness and agitation (Tr. 411). Ms. Berry discontinued the Invega and started Plaintiff on Symbyax (Tr. 412).

On February 25, 2009, Ms. Sheldon again noted that Plaintiff's "high energy level is reflected in increased motor activity, restlessness, and agitation" and also noted that "[her] impulsivity has been reflected in poor financial decisions" (Tr. 471).

On March 4, 2009, Ms. Sheldon noted that Plaintiff was having increased stress related to her grandchildren (Tr. 471).

At her medication check appointment on March 11, 2009, Plaintiff reported that she had not experienced any side effects with the Symbyax (Tr. 409) Plaintiff also stated that she had noted decreased agitation and had no episodes of mania (Tr. 409). On exam, her affect was only slightly anxious (Tr. 409).

On March 18, 2009, Ms. Sheldon noted: "In spite of attempts to try to get the client to be more realistic, her grandiosity continued. The client described a pattern of attaining far less sleep than would normally be needed. The client reported a behavior pattern that reflects a lack of normal inhibition and an increase in impulsivity without regard to potentially painful consequences." (Tr. 472) Plaintiff stated she was flying to Arizona at the request of her daughter, but she has a fear of flying and was concerned her grandchildren would not have adequate care (Tr. 472). Ms. Sheldon also noted that Plaintiff "is slipping from mania to depression quite frequently now and it is causing problems with parenting and relationships" (Tr. 472).

On April 1, 2009, Ms. Sheldon noted that Plaintiff showed no evidence of pressured speech but that her attention shifted quickly from one stimulus to the next (Tr. 473).

On April 8, 2009, Ms. Sheldon noted Plaintiff's high energy level and short attention span (Tr. 473). She appeared anxious (Tr. 473).

The therapy session on April 15, 2009, again was directed at Plaintiff's mania and hypomania (Tr. 473).

-20-

On April 22, 2009, Ms. Sheldon noted that Plaintiff had "[s]ome thinking errors about a recent call from Child Protective [S]ervices" that she received after an upstairs neighbor complained about her grandchild's screaming (Tr. 474).  According to Ms. Sheldon, "[t]his has been a major stress and places client in manic stage where she becomes very agitated and argumentative" (Tr. 474).

On April 29, 2009, Ms. Sheldon noted that Plaintiff "showed no evidence of pressured speech in today's session" and "demonstrated normal motor activity" (Tr. 474). Plaintiff reported "being able to stay calm and relaxed" and getting 6 to 8 hours of sleep per night (Tr. 475).  Ms. Sheldon also noted that Plaintiff "is motivated to find employment but to date has not been able to due to her mania" (Tr. 475).

At her medication check on May 6, 2009, Plaintiff reported that her primary care physician said the Symbyax was causing her blood sugars to be too high, but she would not consider discontinuing the medication because she feels "normal" and better than she has in years (Tr. 491). She reported that "her thought racing has resolved" (Tr. 491).  Plaintiff admitted that she was not following a diabetic diet, but stated she was planning to work on that (Tr. 491). She also announced that she was volunteering at the YMCA (Tr. 491).  Ms. Bowen confirmed that Plaintiff had shown significant improvement, with no evidence of mania (Tr. 492).  She also stated that Plaintiff was managing her stress much better now (Tr. 492).  Ms. Sheldon noted that Plaintiff "is stable with her current medications consisting of Neurontin and Symbyax" and made no changes (Tr. 492). She directed Plaintiff to return for another medication check in 2 months (Tr. 492).

Plaintiff also told Ms. Sheldon on May 6, 2009, that "I feel normal" (Tr. 475). She reported that her volunteer work was going very well (Tr. 475).

On June 3, 2009, Plaintiff reported she had cut back on her volunteer work because she was becoming more agitated (Tr. 476).  Ms. Sheldon noted that "[t]he

-21-

client was restless and agitated within the session and reports an inability to sit quietly and relax" (Tr. 476).

The therapy session on June 17, 2009, focused on problem solving around parenting (Tr. 476).

On July 1, 2009, Plaintiff was focused on her extended family and their poor decision making (Tr. 476).

On July 8, 2009, Plaintiff reported regaining a sense of attachment in participation with others but said she was experiencing some lack of energy and irritability (Tr. 477).

On July 23, 2009, Plaintiff told Ms. Berry that her primary care physician had talked to her again about the Symbyax increasing her weight and raising her blood sugars, but she remained adamant that she wanted to stay on the medication (Tr. 489). Ms. Berry and Ms. Bowen counseled her at length to follow her diabetic diet, which she had not been doing (Tr. 489). Plaintiff reported some agitation but Ms. Bowen noted her "mood remains stable" and did not change her medication (Tr. 489-90).

On July 30, 2009, Ms. Sheldon noted that Plaintiff's "pressured speech has shown evidence of a decrease in intensity" but her "high energy level is reflected in increased motor activity, restlessness, and agitation" (Tr. 477). It was also noted that Plaintiff "gave evidence of a very expansive mood that can easily turn to impatience and irritability if her behavior is blocked or confronted" (Tr. 477). Plaintiff's "flight of ideas and pressured speech were countered by [Ms. Sheldon] repeatedly bringing [her] back to the topic at hand and reminding her of the need for follow-through on her behavior" (Tr. 477). Ms. Sheldon thought that changes occurring in Plaintiff's daily schedule "directly relates to her current mania" (Tr. 477).

On August 5, 2009, Ms. Sheldon noted that Plaintiff showed no evidence of pressured speech and she was able to stayed focused on one topic in a conversation (Tr. 477).  Plaintiff reported she was unable to maintain volunteer work because it makes her irritable and spurs on a manic episode (Tr. 478).

On September 2, 2009, Ms. Sheldon noted: "Bi Polar is stable today. Medication reportedly working better.  Med evaluations taking place regularly. Moderate stress at home with [grandchildren].  Will continue monthly maintenance next two months."  (Tr. 478).

At her medication check on September 10, 2009, Plaintiff reported "feeling well" (Tr. 487).  Ms. Berry described Plaintiff's mood as "fairly stable," but added: "I continue to see that the patient as unable to work given her history of unstable moods. Medication she is currently on has been helpful in respect to that." (Tr. 488)

Ms. Berry completed a medical source statement on October 6, 2009 (Tr. 481-86). She provided a diagnosis of bipolar I disorder, most recent episode mixed (Tr. 481). She listed a current GAF score of 50 and indicated this was also the highest GAF score in the past year (Tr. 481). Regarding the effect of medication on Plaintiff's disorder, Ms. Berry noted "improvement, not fully abated" (Tr. 483).

Ms. Berry opined that Plaintiff had "marked" limitations in activities of daily living, social functioning, and concentration, persistence, or pace, and also that Plaintiff had four or more episodes of decompensation, each of extended duration (Tr. 483). She rated Plaintiff's mental abilities as "poor or none" in most areas needed to do unskilled work, including maintaining regular attendance, sustaining an ordinary routine, working in proximity to others, accepting instructions and responding appropriately to criticism, getting along with co-workers, dealing with normal work stress, adhering to basic standards of neatness and cleanliness, and functioning independently (Tr. 485-86).

At the administrative hearing on October 7, 2009, Plaintiff appeared in person and was represented by counsel (Tr. 38).  Plaintiff testified she was last employed by a temporary agency and was assigned to work part-time as a "flagger" for a railroad (Tr. 40).  She previously worked for a meat packing plant but suffered slip-and-fall injuries and was let go because of her "mental illnesses" (Tr. 41-42). She also worked in a seasonal job setting highway barricades before being injured (Tr. 42). She had worked as cashier and assistant manager at a convenience store, but she was "let go" because  "different people that took over" (Tr. 42).

Plaintiff testified that she suffers from "really bad" mood swings (Tr. 43). Because of the mood swings, there are days when she cannot cope with people (Tr. 43). She experiences depressive periods that could last for a few days (Tr. 43). Because of her bipolar disorder, she cannot always remember names or appointments, and she has to keep a calendar and a journal (Tr. 44). She has trouble remembering the names of classmates she has known for years (Tr. 44). She often abandons projects such as laundry and housecleaning when she becomes bored (Tr. 44). She experiences racing thoughts, which makes it difficult to sleep (Tr. 45). She has anger control problems, which sometimes cause her to "blurt off at the mouth" and throw things (Tr. 45). She once threatened to kill a foreman at the meat packing plant (Tr. 46). She has lost jobs because of her anger problem (Tr. 46). Her prescribed medications improved her mood symptoms, but she still suffers from anger and anxiety attacks (Tr. 47).

Plaintiff testified she lives with her grandchildren, who were 8 years and 15 months of age (Tr. 52). The older child receives Social Security disability payments because of a seizure disorder (Tr. 53-54). Plaintiff attends classes at Goodwill 5 days each week, for 5 hours each day (Tr. 51). In the classes, she and other students learn how to cope with their illnesses (Tr. 51). The subjects of the classes include bipolar disorder and smoking cessation (Tr. 51). She attends physical therapy three days per week (Tr. 56). She also shops for groceries and other necessities (Tr. 54-55).

-24-

Sue Bowen, Plaintiff's case manager at Goodwill Industries, testified that she had worked with Plaintiff for two years and saw her three to four times a week (Tr. 56-57). She has "observed [Plaintiff's] mood swings, her agitation, anxiety, stress, her difficulty [with] problem solving and just basically struggling some days with life in general" (Tr. 57). Regarding Plaintiffs difficulty with problem solving, Ms. Bowen testified: " It's just difficult for her to segment whatever the issue is and to figure out the appropriate path to take. Frequently I think it's guided by emotion, over reacting rather than using sound decision making." (Tr. 57) She agreed that Plaintiff has pressured speech and stated that "[w]hen she's manic she's just out of control, very loud, hard to redirect, easily agitated" (Tr. 57). She said Plaintiff cannot handle stressful situations very well (Tr. 57). Ms. Bowen further testified that Plaintiff has problems with concentration and attention and has difficulty reading; Plaintiff frequently brings in documents for her to look at and advise her on and does not always understand newspaper articles she reads (Tr. 58). Plaintiff is unable to remember appointments without using a daily planner, and Ms. Bowen frequently accompanies Plaintiff to her appointments because she has a hard time remembering what is said (Tr. 58). Ms. Bowen stated that Plaintiff has problems with anger control and "flies off the handle, frequently takes things very personally, doesn't always perceive the situation maybe correctly, she's just very quick to anger." (Tr. 58) She also testified that Plaintiff has problems getting along with other people, noting that Plaintiff "kind of likes to be the center of attention and . . . sometimes misperceives those subtle interactions, maybe body language or facial expressions. I think that's hard for her to distinguish, and she gets angry." (Tr. 59) She indicated that Plaintiff can handle criticism if it is "tactful and well meaning," but if not, she "pretty much flies into a rage" (Tr. 59). Ms. Bowen also stated that Plaintiff can respond in a "fairly positive" manner to supervision but is a creature of habit, and cannot adjust well to changes in routine (Tr. 59).

The ALJ asked the vocational expert about a person of Plaintiff's age, education, and work experience who was limited to lifting and carrying 50 pounds occasionally and 25 pounds frequently; standing, walking, and sitting 6 hours each in

an 8-hour work day; performing simple, repetitive tasks; and adapting to usual changes in work settings (Tr. 64-65).  The vocational expert testified that such a person could perform Plaintiff's past work as a pizza delivery driver, highway flagger, sales attendant, and highway barricade setter (Tr. 65).

Plaintiff's attorney then asked the vocational expert a hypothetical question which he said was based on the mental impairment and mental capacities evaluation forms that Dr. Sood and Mr. Nelson completed on November 7, 2008.  He asked:

> [A]ssume a person with the same age, education and work history as in the previous hypotheticals. In addition we have these limitations. Due to mental conditions would be able to work less than three hours in the work day; and limitations which, in these areas which was defined as the ability to function is seriously limited but not precluded, but would not be satisfactory, in the areas of following work rules; relate to co-workers, deal with the public, use judgment, interact with supervisors, deal with work stresses, function independently, maintain attention, concentration, and understand, remember and carry out simple job instructions. Could such a person do any of her past work?

(Tr. 66-67)  The VE answered "No" and also said there were no other jobs in the national economy such a person could do (Tr. 67).

Plaintiff's attorney also asked a second hypothetical question which he said was based on the medical source statement that Linda Berry completed on October 6, 2009.  He asked:

> [A]gain with the same age, education and past work history as in the previous hypothetical questions with the following additional limitations. And she was rated as having no useful ability to function in the following areas. Maintain regular attendance and be punctual within customary usually strict tolerances; sustain an ordinary routine without special supervision, work in coordination and within proximity to others without being unduly distracted; complete a normal work day and work week without interruptions from psychologically based symptoms;

-26-

accept instructions and respond appropriately to criticism from supervisors; get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes; respond appropriately to changes in a routine work setting; deal with normal work stress; interact appropriately with the general public; maintain socially appropriate behavior; use judgment and function independently. Would such a person be able to perform any of the claimant's past work?

(Tr. 67) The VE again responded "No" to this question and to the follow-up question regarding whether there would be any other jobs in the national economy that such a person could perform (Tr. 67-68).

## II. DISCUSSION

The applicable standard of review is whether the Commissioner's decision is supported by substantial evidence on the record as a whole. *See Finch v. Astrue*, 547 F.3d 933, 935 (8th Cir. 2008). " Substantial evidence is less than a preponderance but is enough that a reasonable mind would find it adequate to support the conclusion." *Id.* (internal quotations and citations omitted). Evidence that both supports and detracts from the Commissioner's decision should be considered, but a final administrative decision is not subject to reversal by a reviewing court merely because some evidence in the record may support a different conclusion. *See id.* Questions of law, however, are reviewed de novo. *See Olson v. Apfel*, 170 F.3d 822 (8th Cir. 1999); *Boock v. Shalala*, 48 F.3d 348, 351 n2 (8th Cir. 1995).

### A. The ALJ's "Step Three" Findings

In this case, the opinions provided by sources at Mid-Plains Center, if accepted as true, would lead to the conclusion that Plaintiff's bipolar disorder is a disabling condition because it meets the requirements of 20 C.F.R. pt. 404, subpt. P., App. 1 § 12.04, the listing for affective disorders ("[c]haracterized by a disturbance of mood,

accompanied by a full or partial manic or depressive syndrome.").[13] In a medical source statement prepared on October 6, 2009, Linda Berry, APRN, opined that Plaintiff had "marked" limitations in activities of daily living, social functioning, and concentration, persistence, or pace, and had experienced four or more episodes of decompensation, each of extended duration (Tr. 483). Navdeep Sood, M.D., and Mark Nelson also indicated in a mental impairment evaluation form they both signed on November 7, 2008, that Plaintiff was "markedly limited" in all aspects of "social interaction" and "sustained concentration and persistence" (Tr. 402-03).

The ALJ found, however, that Plaintiff has "mild" restrictions in her activities of daily living and in social functioning, has "moderate" restrictions in maintaining concentration, persistence, or pace, and has experienced just "one or two" episodes of decompensation. He explained:

> In activities of daily living, the claimant has mild restriction. Even as the claimant has alleged limitations in her daily life, she admits regular attendance at Goodwill Services classes (for as long as 6 hours

---

[13]A claimant who has "[b]ipolar syndrome with a history of episodic periods manifested by the full symptomatic picture of both manic and depressive syndromes (and currently characterized by either or both syndromes)" will be considered disabled when the impairment results in at least two of the following ("paragraph B" criteria):

1. Marked restriction of activities of daily living; or
2. Marked difficulties in maintaining social functioning; or
3. Marked difficulties in maintaining concentration, persistence, or pace; or
4. Repeated episodes of decompensation, each of extended duration[.]

*Id*. at § 12.04B. The listing will be also be satisfied where the claimant has a "[m]edically documented history of a chronic affective disorder of at least 2 years' duration that has caused more than a minimal limitation of ability to do basic work activities, with symptoms or signs currently attenuated by medication or psychosocial support, and . . . [r]epeated episodes of decompensation, each of extended duration[.]" *Id*. at § 12.04C.

-28-

per day), she continues to care for 2 grandchildren, she remains able to prepare simple meals, do laundry, and do light housekeeping, and she remains able to self-groom and maintain other personal care without assistance. The claimant therefore is determined to have only a mild limitation in this domain.

In social functioning, the claimant has mild difficulties. The claimant repeatedly has alleged that she self-isolates. She also has complained of irritability and aggressiveness toward other people. She has repeatedly admitted to her treating sources, however, that she has improved significantly on her medication. She has reported to the State Agency that she takes daily walks and socializes with her neighbor. As indicated, she also leaves the house for hours at a time, to attend classes and run errands. She interacts with Goodwill staff and other clients. In this domain, therefore, her limitation is assessed as mild.

With regard to concentration, persistence or pace, the claimant has moderate difficulties. Although the claimant has repeatedly claimed that she cannot concentrate, she "spaces out," she loses focus, and she goes off on tangents, she also has admitted attending classes at Goodwill Services, and watching 4 hours of TV per day. At most, therefore, the undersigned finds that she has a moderate limitation in this domain.

As for episodes of decompensation, the claimant has experienced one to two episodes of decompensation, each of extended duration. While both the claimant and her social worker have characterized the claimant's episodes of decompensation as "repeated," they are rarely documented in the medical evidence.

(Tr. 20-21)

Plaintiff does not directly challenge the ALJ's determination at step three of the five-step sequential evaluation process that she does not meet the requirements of listing 12.04.  Instead, she argues that the ALJ erred in assessing her mental RFC[14]

_____

[14] The RFC assessment is made after the "step three" determination and includes a more detailed analysis of the "paragraph B" criteria for listed mental

and then finding at step four that she retains the residual functional capacity to perform past relevant work.

### B.  The ALJ's Mental RFC Findings

A claimant's residual functional capacity represents the most she can do despite the combined effect of her credible limitations. *See* 20 C.F.R. §§ 404.1545, 416.945. The ALJ is responsible for assessing a claimant's RFC based on all the relevant evidence, including the claimant's description of her limitations, the medical records, and observations of the claimant's physicians and others. *See Young v. Apfel*, 221 F.3d 1065, 1069 n.5 (8th Cir. 2000). In making this assessment, the ALJ has discretion to discredit a claimant's self-reported limitations if he determines they are inconsistent with the record based on his evaluation of the relevant factors set forth in *Polaski v. Heckler*, 739 F.2d 1320 (8th Cir. 1984), and 20 C.F.R. §§ 404.1529, 416.929. Such factors include the claimant's prior work records; observations by third parties and physicians regarding the claimant's disability; the claimant's daily activities; the duration, frequency, and intensity of pain; precipitating and aggravating factors; dosage, effectiveness and side effects of medications; and the claimant's self-imposed functional restrictions. *See Polaski*, 739 F.2d at 1322. "The ALJ bears the primary responsibility for determining a claimant's RFC and because RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) (quoting *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir. 2010)).  "However, the burden of persuasion to prove disability and demonstrate RFC remains on the claimant." *Id.*

---

impairments.  As stated in the ALJ's decision: "The limitations identified in the 'paragraph B' criteria are not a residual functional capacity assessment but are used to rate the severity of mental impairments at steps 2 and 3 of the sequential evaluation process. The mental residual functional capacity assessment used at steps 4 and 5 of the sequential evaluation process requires a more detailed assessment by itemizing various functions contained in the broad categories found in paragraph B of the adult mental disorders listings in 12.00 of the Listing of Impairments (SSR 96-8p)." (Tr. 21)

The ALJ found that Plaintiff "has the residual functional capacity to perform medium work as defined in 20 CFR 404.1567(c) and 416.967(c)[15] except she is limited to simple repetitive tasks; she can maintain concentration, attention, persistence and pace; she can interact with and relate to others; she can adapt to usual changes in the work setting; and she can adhere to safety rules."  (Tr. 21)  Plaintiff takes exception to each of the ALJ's findings related to her mental RFC.[16]

### 1.  Plaintiff's Ability to Remember and Follow Simple Instructions

First, regarding the ALJ's finding that she can perform "simple repetitive tasks," Plaintiff notes that Dr. Sood and Mr. Nelson found that she was "markedly limited" in being able to understand, remember, and carry out very short and simple instructions (Tr. 402, 407) and to make simple work-related decisions (Tr. 403).  The ALJ did not address this particular evidence, but generally concluded that the opinions of Dr. Sood and Mr. Nelson should be given only "minimal weight."  After observing that "Dr. Sood and Mr. Nelson assessed the claimant as having 'marked' limitations in *every* functioning area, resulting in an ability to work 0-3 days per week, at most *only*," (Tr. 28 (emphasis in original)), the ALJ stated:

---

[15] "Medium work involves lifting no more than 50 pounds at a time with frequent lifting or carrying of objects weighing up to 25 pounds." 20 C.F.R. §§ 404.1567(c), 416.967(c).  Plaintiff does not dispute the ALJ's assessment of her physical RFC.

[16] "The RFC assessment must first identify the individual's functional limitations or restrictions and assess his or her work-related abilities on a function-by-function basis, including the functions in paragraphs (b), (c), and (d) of 20 CFR 404.1545 and 416.945." Social Security Ruling ("SSR") 96-8p, 1996 WL 374184, at *1 (Soc. Sec. Admin., July 2, 1996).  In assessing mental RFC, the ALJ is to determine whether the claimant has "limitations in understanding, remembering, and carrying out instructions, and in responding appropriately to supervision, co-workers, and work pressures in a work setting." 20 C.F.R. §§ 404.1545(c), 416.945(c).

The undersigned is unable to give controlling, or even great weight to this assessment, despite the identification of Dr. Sood and Mr. Nelson as treating sources. The level of marked impairment, as described by Dr. Sood and Mr. Nelson is inconsistent with the claimant's ability to maintain independent functioning, including caring for 2 grandchildren. It is inconsistent with her admitted daily participation at Goodwill Services for multiple days each week, and for up to 6 hours each day. It also is inconsistent with the clinical progress notes, as completed by Dr. Sood, Mr. Nelson and other facility staff. Since this assessment is inconsistent with the bulk of evidence by these same sources, the undersigned gives it minimal weight.

(Tr. 28)

Significantly, Ms. Berry disagreed with Dr. Sood and Mr. Nelson's assessment that Plaintiff would be "poor" at understanding, remembering, or carrying out short and simple instructions (Tr. 446). In her opinion, Plaintiff possesses "good" abilities (meaning "limited but satisfactory") in these functional areas (Tr. 484-85). Ms. Berry also opined that Plaintiff has "good" ability to make simple work-related decisions (Tr. 485). This opinion is consistent with a mental RFC assessment that was prepared by consulting psychologist Linda Schmechel, Ph.D., who found that Plaintiff was "not significantly limited" in being able to understand, remember, and carry out short and simple instructions, or in being able to make simple work-related decisions (Tr. 332). Ms. Berry's opinion is also consistent with treatment notes prepared by Kim Baker, APRN, who was monitoring Plaintiff's medications before Ms. Berry assumed that responsibility at Mid-Plains Center. Ms. Baker routinely noted that Plaintiff demonstrated good memory, insight, and judgment (Tr. 268, 270, 272, 274, 278, 280, 282, 284, 286, 367, 369, 371, 373). In fact, on the single occasion when Dr. Sood examined Plaintiff, on November 13, 2007, he noted that she had "[g]ood insight and judgment" and "[n]o problems with memory." (Tr. 524) Susan Lindblad, Ph.D., also found "[n]o problems related to memory" when she examined Plaintiff on January 14, 2009 (Tr. 463).

-32-

The ALJ identified Dr. Sood as a "treating source."  Social Security regulations define a "treating source" to be an "acceptable medical source" who provided the claimant "with medical treatment or evaluation and who has, or has had, an ongoing treatment relationship with [the claimant]." 20 C.F.R. §§ 404.1502, 416.902.  The term "acceptable medical source" includes licensed physicians, licensed or certified psychologists, and, for limited purposes only, licensed podiatrists and qualified speech-language pathologists.[17]  *See* 20 C.F.R. §§ 404.1513(a), 416.913(a).

"If [the Commissioner] find[s] that a treating source's opinion on the issue(s) of the nature and severity of [the claimant's] impairment(s) is well-supported by medically acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other substantial evidence in [the claimant's] case record, [the Commissioner] will give it controlling weight." 20 C.F.R. §§ 404.1527(d), 416.927(d).  Otherwise, the weight the Commissioner will give to a medical opinion[18] depends upon (1) whether the source examined the claimant, and, if so, the frequency of examination; (2) whether the source treated the claimant, and, if so, the length, nature, and extent of the treatment relationship; (3) whether the opinion is supported by relevant evidence; (4) whether the opinion is consistent with the record as a whole;

---

[17] The ALJ also identified Mr. Nelson as a treating source, but this appears incorrect since he is not designated as either an M.D. or a Ph.D.  He may have provided therapy to Plaintiff between August 2007 and December 2008, but, as noted previously, the medical records that were provided by Mid-Plains Center do not contain his treatment notes.  This oversight should be corrected on remand. *See Johnson v. Astrue*, 627 F.3d 316, 319-20 (8th Cir. 2010) (social security hearings are non-adversarial and an ALJ has a duty to fully develop the record, even when the claimant is represented by an attorney).

[18] "Medical opinions are statements from physicians and psychologists or other acceptable medical sources that reflect judgments about the nature and severity of [the claimant's] impairment(s), including [his or her] symptoms, diagnosis and prognosis, what [he or she] can still do despite impairment(s), and [his or her] physical or mental restrictions." 20 C.F.R. §§ 404.1527(a)(2), 416.927(a)(2) .

(5) whether the source is a specialist; and (6) any other relevant factors.  *See* 20 C.F.R. §§ 404.1527(d), 416.927(d).  "In many cases, a treating source's medical opinion will be entitled to the greatest weight and should be adopted, even if it does not meet the test for controlling weight."  SSR 96-2p, 1996 WL 374188, at *5 (Soc. Sec. Admin., July 2, 1996).  An adverse decision "must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight."  *Id.*

"Although the factors in 20 CFR 404.1527(d) and 416.927(d) explicitly apply only to the evaluation of medical opinions from 'acceptable medical sources,' these same factors can be applied to opinion evidence from 'other sources.'"  SSR 06-03p, 2006 WL 2329939 , at *4-5 (Soc. Sec. Admin., Aug. 9, 2006).  Thus, factors for considering opinion evidence from "other sources" (both medical and non-medical) include (1) how long the source has known and how frequently the source has seen the individual; (2) how consistent the opinion is with other evidence; (3) the degree to which the source presents relevant evidence to support an opinion; (4) how well the source explains the opinion; (5) whether the source has a specialty or area of expertise related to the individual's impairment(s); and (6) any other factors that tend to support or refute the opinion.  *See id.* at *4-5.

"Since there is a requirement to consider all relevant evidence in an individual's case record, the case record should reflect the consideration of opinions from medical sources who are not 'acceptable medical sources' and from 'non-medical sources' who have seen the claimant in their professional capacity.  Although there is a distinction between what an adjudicator must consider and what the adjudicator must explain in the disability determination or decision, the adjudicator generally should explain the weight given to opinions from these 'other sources,' or otherwise ensure that the discussion of the evidence in the determination or decision allows a claimant

or subsequent reviewer to follow the adjudicator's reasoning, when such opinions may have an effect on the outcome of the case." *Id.* at *6.

"The fact that a medical opinion is from an 'acceptable medical source' is a factor that may justify giving that opinion greater weight than an opinion from a medical source who is not an 'acceptable medical source' . . ..  However, depending on the particular facts in a case, and after applying the factors for weighing opinion evidence, an opinion from a medical source who is not an 'acceptable medical source' may outweigh the opinion of an 'acceptable medical source,' including the medical opinion of a treating source.  For example, it may be appropriate to give more weight to the opinion of a medical source who is not an 'acceptable medical source' if he or she has seen the individual more often than the treating source and has provided better supporting evidence and a better explanation for his or her opinion." *Id.* at *5.

I conclude that the ALJ properly determined not to give controlling weight to Dr. Sood's opinion regarding Plaintiff's ability to understand, remember, and carry out simple instructions and to make simple work-related decisions because it is not supported by, and, in fact, is inconsistent with, Plaintiff's treatment records at Mid-Plains Center.  A treating source opinion "does not automatically control in the face of other credible evidence on the record that detracts from that opinion." *Heino v. Astrue*, 578 F.3d 873, 880 (8th Cir. 2009).

I also conclude that it was proper for the ALJ to give only "minimal weight" to the opinion.  Although the form submitted by Dr. Sood and Mr. Nelson indicates they had treated Plaintiff "since 6/25/06" (Tr. 399), the record only shows that Dr. Sood saw Plaintiff twice, once on March 7, 2007, when he was present during Plaintiff's visit to Ms. Baker (Tr. 271), and again on November 7, 2007, when he conducted the examination (Tr. 523-24). The record also shows that Dr. Sood wrote prescriptions for

-35-

Plaintiff in October and November 2007, but that the rest of the time her medications were prescribed by the nurses at Mid-Plains Center (Tr. 364-650).[19]

Under these circumstances, it would be reasonable for the ALJ to give more weight to the contrary opinion of Ms. Berry, who, even though not an "acceptable medical source," saw Plaintiff on a regular basis from and after January 8, 2008. As discussed above, Dr. Sood's opinion is also inconsistent with other evidence in the record, including his own notation on November 7, 2007, that on examination Plaintiff displayed good insight and judgment and had no problems with memory. "It is permissible for an ALJ to discount an opinion of a treating physician that is inconsistent with the physician's clinical treatment notes." *Davidson v. Astrue*, 578 F.3d 838, 842 (8th Cir. 2009).

Dr. Sood provided no explanation for his opinion, which was provided to Plaintiff's counsel in a checklist format. A medical source statement cannot be discounted "on the basis that the 'evaluation by box category' is deficient *ipso facto*," but where the limitations listed on the form "stand alone" and are not mentioned in treatment records nor supported by any objective testing or reasoning, the statement may be entitled to little or no weight. *See Reed v. Barnhart*, 399 F.3d 917, 921 (8th Cir. 2005). *See also Hurd v. Astrue*, 621 F.3d 734, 739 (8th Cir. 2010) (ALJ justified in giving little weight to opinion of treating physician who saw claimant only 4 times and prepared statement at request of claimant's attorney rather than in course of treatment).

## 2. Plaintiff's Ability to Maintain Attention and Concentration

The second RFC finding made by the ALJ was that Plaintiff "can maintain concentration, attention, persistence and pace" (Tr. 21). Plaintiff points out this

---

[19] It appears Dr. Sood may have been consulted by Ms. Berry in March 2008 regarding a change in medications (Tr. 431).

finding is inconsistent with the ALJ's determination at step three that Plaintiff has "moderate" difficulties regarding concentration, persistence, and pace (Tr. 20-21). The Commissioner claims that "the ALJ's limitation to simple, routine work adequately accounted for plaintiff's moderate limitations in . . . sustaining attention and concentration for extended periods" (filing 22 at 19), but this is not what the ALJ decided in assessing Plaintiff's RFC.

The ALJ stated in his decision that Plaintiff "has the residual functional capacity to perform medium work . . . except she is limited to simple repetitive tasks; she can maintain concentration, attention, persistence and pace; she can interact with and relate to others; she can adapt to usual changes in the work setting; and she can adhere to safety rules." (Tr. 21)  As was made clear in the hypothetical question that he posed to the vocational expert, the ALJ found that Plaintiff "retains the ability to perform simple, repetitive tasks *as well as* maintain attention, concentration, persistence and pace; [she] retains the ability to relate to and interact with others; [she] retains the ability to adapt to usual changes in work settings; and [she] can adhere to safety rules." (Tr. 64-65 (emphasis supplied))  In other words, the ALJ expressly found that the Plaintiff is not limited in terms of maintaining attention, concentration, persistence, or pace.[20]

---

[20] This case is therefore distinguishable from *Howard v. Massanari*, 255 F.3d 577, 582 (8th Cir. 2001), in which the ALJ's hypothetical assumed that the claimant was able to do simple, routine, repetitive work. The Eighth Circuit determined this hypothetical adequately captured the claimant's "often" deficiencies in concentration, persistence or pace where the state agency psychological consultant opined that the claimant was still "able to sustain sufficient concentration and attention to perform at least simple, repetitive, and routine cognitive activity without severe restriction of function." *Id.* While "restricting a claimant to simple tasks can address a deficiency in concentration, persistence and pace *if* that deficiency *was found to apply only to complex tasks*," *Chambers v. Barnhart*, 2003 WL 22512073, at *5 n.2 (10th Cir. 2003) (emphasis in original), no such finding was made by the ALJ in this case.

Plaintiff also notes that Dr. Schmechel, the state agency psychologist, indicated in completing a psychiatric review technique form that she has "moderate" limitations regarding concentration, persistence, and pace (Tr. 346), and, consistent with this finding, indicated when assessing Plaintiff's mental RFC that she is "moderately" limited in the ability to maintain attention and concentration for extended periods (Tr. 332). These findings subsequently were affirmed by another state agency consulting psychologist, Jennifer Bruning Brown, Ph.D., after reviewing Plaintiff's updated medical records (Tr. 378). The ALJ gave "little weight" to Dr. Schmechel's RFC assessment because he thought it took substance abuse into consideration. The ALJ stated:

> On August 1, 2007, the State Agency assessed the claimant to have multiple "moderate" limitations, when her bipolar and substance abuse impairments were considered in combination (Exhibit 6F).

> Because the treating source evidence does not document ongoing substance abuse, the restrictions assessed by the State Agency are given little weight.

(Tr. 27)

The ALJ misread Exhibit 6F, which contains both the RFC assessment and the psychiatric review technique form ("PRTF"). Dr. Schmechel gave consideration in the PRTF to Plaintiff's "Bipolar disorder" under listing 12.04 (Tr. 339), "Hx of PTSD" under listing 12.06 (Tr. 341), and "Etoh [alcohol] and cocaine dependence *in sustained remission*" under listing 12.09 (Tr. 344 (emphasis supplied)). She also noted: "There was a hx of meth, cocaine and ice use in her 20s as well as LSD experimentation but none recent. . . . Goodwill staff believed drug use was as recent as 2005." (Tr. 348) There is no indication Dr. Schmechel considered any "ongoing substance abuse" in the RFC assessment.

The Commissioner argues, however, that Dr. Schmechel's opinion "is not entitled to any particular weight" under the regulations and, "[m]oreover, 'one

-38-

non-testifying, non-examining expert's opinion cannot be considered substantial evidence to defeat the decision of the ALJ which is supported by substantial evidence.' *Goose v. Apfel*, 238 F.3d 981, 984 (8th Cir. 2001)." (Filing 22 at 18) The problem with this argument is that there is not substantial evidence to support the ALJ's finding that Plaintiff is able to maintain concentration, attention, persistence, and pace.

The only medical opinions concerning Plaintiff's mental limitations that are contained in the record are the opinions provided by Dr. Sood (joined by Mr. Nelson) and Dr. Schmechel (later affirmed by Dr. Bruning Brown),[21] which the ALJ rejected. The Court of Appeals has held that "[i]f the ALJ does not find any of the medical opinions credible, then [he] should develop the record further to include medical evidence of a claimant's limitations." *Flynn v. Astrue*, 513 F.3d 788, 792 (8th Cir. 2008) (citing *Lauer v. Apfel*, 245 F.3d 700, 704 (8th Cir. 2001)). *But cf. Cox v. Astrue*, 495 F.3d 614, 619-20 (8th Cir. 2007) (despite lack of opinion from claimant's treating sources, ALJ's RFC determination regarding claimant's depression and anxiety was sufficiently supported by medical evidence, including treatment records).

In his decision, the ALJ did not reference any medical evidence to support the finding that Plaintiff "can maintain concentration, attention, persistence and pace" (Tr. 21). He merely stated that "[a]lthough the claimant has repeatedly claimed that she cannot concentrate, she 'spaces out,' she loses focus, and she goes off on tangents, she also has admitted attending classes at Goodwill Services, and watching 4 hours of TV per day" (Tr. 21). Apart from the fact that it is unclear how either of these activities evidence an ability to concentrate and maintain attention,[22] the law is clear that a RFC

---

[21] As noted previously, Dr. Jobman also opined that Plaintiff would have difficulty tolerating stress in the workplace, but the ALJ determined he was not qualified to render this opinion and Plaintiff does not dispute this determination.

[22] Plaintiff testified that the types of classes she attends at Goodwill "teach us about our illnesses and how to be able to cope with them in society so it makes our life

determination cannot be made solely on the basis of a claimant's daily activities. "[B]ecause RFC is a medical question, some medical evidence must support the determination of the claimant's RFC." *Martise v. Astrue*, 641 F.3d 909, 923 (8th Cir. 2011) (quoting *Vossen v. Astrue*, 612 F.3d 1011, 1016 (8th Cir.2010)).

In *Hutsell v. Massanari*, 259 F.3d 707 (8th Cir. 2001), the claimant was diagnosed with various chronic schizophrenia-based disorders which, in the opinion of consulting psychologists, would markedly impair her ability to function in the workplace. The ALJ found, however, that "the claimant has function[ed] well despite many types of stresses . . . [and] has the capacity for work other than that which

---

a little bit easier" (Tr. 51). Records from Goodwill show that Plaintiff's performance, at least during 2007, was marginal or even unsatisfactory. The ALJ evidently misread these records, because he states in his decision that "in May 2007, an evaluation by Goodwill Day Services indicated that the claimant had satisfactory community living skills, activities of daily living, social or interpersonal skills, health management or coping skills, communication skills, and leisure-time activity capacity. . . . Her only 'marginal' area was regarding 'pre-vocational skills' or day activities" (Tr. 27). In actuality, Plaintiff received "marginal" ratings for the skills the ALJ identified as being "satisfactory," and "unsatisfactory" ratings for the skills he identified as "marginal" (Tr. 228). The Commissioner concedes this error but deems it unimportant because the "day rehab specialist" who scored Plaintiff's performance was not an "acceptable medical source" and the records were made two years before the ALJ's decision (filing 22 at 20).

Plaintiff's case manager at Goodwill, Sue Bowen, testified at the hearing in October 2009 that Plaintiff has problems with concentration and attention (Tr. 58), and she provided the same opinion in information forms completed in June 2007 (Tr. 185) and December 2007 (Tr. 210). The ALJ dismissed Ms. Bowen's testimony by stating that "[t]he claimant's treating psychotherapy records repeatedly indicate that she is doing better, feeling better, and not experiencing any mania manifestations" (Tr. 29). A review of those records shows, however, that Plaintiff continued to exhibit manic symptoms. On July 30, 2009, for example, Plaintiff's therapist noted that she displayed increased motor activity, restlessness and agitation, and repeatedly needed to be brought back on-topic during the therapy session (Tr. 477).

-40-

involves highly complex tasks requiring abstract thinking or close interpersonal contact." *Id.* at 711.  The Court of Appeals reversed, stating:

> With regard to mental disorders, the Commissioner's decision "must take into account evidence indicating that the claimant's true functional ability may be substantially less than the claimant asserts or wishes." *Parsons v. Heckler*, 739 F.2d 1334, 1341 (8th Cir.1984). Given the unpredictable course of mental illness, "[s]ymptom-free intervals and brief remissions are generally of uncertain duration and marked by the impending possibility of relapse." *Andler v. Chater*, 100 F.3d 1389, 1393 (8th Cir. 1996). Moreover, "[i]ndividuals with chronic psychotic disorders commonly have their lives structured in such a way as to minimize stress and reduce their signs and symptoms." 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(E) (1999). "Such individuals may be much more impaired for work than their signs and symptoms would indicate." *Id.*

> Although the ALJ bears the primary responsibility for assessing a claimant's residual functional capacity based on all relevant evidence, a claimant's residual functional capacity is a medical question. *Lauer*, 245 F.3d at 704; *Singh v. Apfel*, 222 F.3d 448, 451 (8th Cir. 2000). "Where the medical evidence is equally balanced . . . the ALJ resolves the conflict." *Bentley v. Shalala*, 52 F.3d 784, 787 (8th Cir. 1995). As we held in *Lauer*, however, some medical evidence "must support the determination of the claimant's [residual functional capacity], and the ALJ should obtain medical evidence that addresses the claimant's ability to function in the workplace." *Lauer*, 245 F.3d at 704 (internal quotation marks and citation omitted). To properly determine a claimant's residual functional capacity, an ALJ is therefore "required to consider at least some supporting evidence from a [medical] professional." *Id.*

> In this case, the ALJ's residual functional capacity assessment was not properly informed and supported by "some medical evidence" in the record, *see id.*, and thus it cannot stand. Hutsell's medical records show that her impairment is not limited to her ability to engage in close interpersonal contact and for abstract thinking.

*Id.* at 711-12.

The Eighth Circuit noted in *Hutsell* that the claimant's daily activities, which included cooking, cleaning, doing laundry, sometimes visiting friends or socializing at the local senior citizen center, watching a few hours of television, reading the newspaper, listening to the radio for a few hours, driving in town, and shopping for groceries, *id.* at 709, "are consistent with chronic mental disability, *see* 20 C.F.R. Pt. 404, Subpt. P., App. 1, § 12.00(E) (those with chronic mental illness often show fewer symptoms when in structured, low-stress environment)." *Id.* at 713. The Court "also believe[d] that the Commissioner relied too heavily on indications in the medical record that Hutsell was 'doing well,' because doing well for the purposes of a treatment program has no necessary relation to a claimant's ability to work or to her work-related functional capacity." *Id.* at 712. Finally, the Court cautioned that even though the claimant's condition may be in remission, "it is inherent in psychotic illnesses that periods of remission will occur, and that such remission does not mean that the disability has ceased." *Id.* at 713 (quoting *Andler*, 100 F.3d at 1393).

In the present case, Ms. Berry wrote in her October 6, 2009 medical source statement that Plaintiff's bipolar disorder was improved with her current medication but "not fully abated" (Tr. 483).[23] Carrie Sheldon, M.S., made a similar observation on September 9, 2009, when she rated Plaintiff's progress toward meeting various objectives of therapy. Ms. Sheldon noted that Plaintiff had only made "some progress" in being "less agitated and distracted – that is, [being] able to sit quietly and calmly for 30 minutes" and in "manag[ing] intrusive unwanted thoughts" (Tr. 478). She gave Plaintiff a "guarded" prognosis for successful achievement of all therapy goals and provided the following rationale:

> Due to the diabetes Client's medication for her mood disorder sometimes does not work like it should. Historically when she finds a

---

[23] This is consistent with a notation she made on September 10, 2009, in which Plaintiff's mood was described as "fairly stable" and her current medication as "helpful," but Ms. Berry expressed a belief that Plaintiff was "unable to work given her history of unstable moods" (Tr. 488).

med that works it works briefly and then her sugars spike or she feels "drugged". She is unable to be "drugged" as she is caring for her small grandchildren and has to be alert. She is attempting to find medication that works and in the mean time [sic] needs the added support of weekly counseling and community support to stabalize [sic]. She has a rapid cycle between mania and depression sometimes this is related to blood sugars and sometimes triggered by stress or an event.

(Tr. 479).

Ms. Berry specifically opined on October 6, 2009, that Plaintiff has a "marked" limitation in concentration, persistence or pace (Tr. 483).[24]  However, the ALJ gave "little weight" to any of Ms. Berry's opinions, stating:

> Despite Ms. Berry's identification as a treating source,[25] the undersigned cannot give her assessment controlling, or even great weight, because she is not a licensed medical doctor, psychiatrist or psychologist. Additionally, she has indicated marked functional limitations in virtually every mental health category. This is inconsistent with the claimant's own description of her daily functioning capacity, with her ongoing ability to live alone as well as to care for 2 small grandchildren, and with the claimant's repeated reports that she is doing

---

[24] Similarly, Dr. Sood and Mr. Nelson jointly opined that Plaintiff's condition "constantly" interfered with attention and concentration (Tr. 400), that she was "markedly limited" in her ability to maintain attention and concentration for extended periods (Tr. 402), and that she would have "poor" ability to maintain attention and concentration while on the job (Tr. 407).  As previously discussed, the ALJ gave "minimal weight" to their opinions as being inconsistent with Plaintiff's daily activities and her treatment records at Mid-Plains Center (including Ms. Berry's notations). Unlike their opinion regarding Plaintiff's memory skills, which found no support in Mid-Plains Center's records, Dr. Sood did make a notation when he examined Plaintiff on November 13, 2007, that she had "some problems" with concentration (Tr. 524).

[25] By definition, Ms. Berry is not a "treating source" because she is not an "acceptable medical source."  *See* 20 C.F.R. §§ 404.1502, 416.902.

well on her medication, with no complaints. Because this inconsistency between such marked limitations, as assessed by Ms. Berry, and the claimant's daily functioning, as reported by the claimant and as described elsewhere in the treating records, has not been clarified, Ms. Berry's assessment is given little weight.

(Tr. 29)  One possible explanation for the inconsistency the ALJ found between Ms. Berry's assessment of Plaintiff's limitations and her recent treatment records is that the medical source statement form directed Ms. Berry to respond "for the period during which you treated Ms. Ponce" (Tr. 481), and, in making the assessment, to "[c]onsider the medical history, the chronicity of findings (or lack thereof), and the expected duration of any work-related limitations" (Tr. 483).

In any event, the ALJ's hearing did not take place until 29 months after the alleged onset date of Plaintiff's disability.  The duration requirement for DIB and SSI is 12 months.  *See* 20 C.F.R. §§ 404.1509, 416.909.  Thus, even though Plaintiff's condition was improved by the time of the hearing, the ALJ should have considered whether she was at least entitled to a closed period of disability starting from the alleged onset date.  *See Harris v. Secretary of DHHS, 959 F.2d 723, 724 (8th Cir. 1992)* ("This court consistently has held that disability is not an 'all-or-nothing' proposition; a claimant who is not entitled to continuing benefits may well be eligible to receive benefits for a specific period of time.").

### 3. Plaintiff's Ability to Interact with Co-Workers and Supervisors

The ALJ also found that Plaintiff "can interact with and relate to others" (Tr. 21).[26]  He cited no medical evidence in support of this finding, but instead appears to

---

[26] The ALJ stated earlier in the decision that Plaintiff had "mild difficulties" in social functioning (Tr. 20).

-44-

have based his decision primarily upon Plaintiff's attendance at Goodwill classes.[27]
The ALJ stated:

> The claimant reported to the State Agency and also testified at her
> hearing that she "isolates" and stays home. She does not want to be
> around other people. She also reported (and testified) to attending daily
> classes at Goodwill Services. She has described to treating sources that
> she attends class up to 6 hours per day. She testified that she will go to
> any class which is offered. She also admitted to treating sources that if
> she is feeling bad, she always leaves class in a good mood. The
> undersigned therefore finds that there is a significant inconsistency in the
> claimant's daily activities and social functioning, when compared to her
> alleged self-isolation and inability to tolerate the public. Since this
> inconsistency has not been clarified, it affects the claimant's credibility
> adversely.[28]

(Tr. 26-27)

The state agency psychologist concluded on August 1, 2007, that Plaintiff is
"moderately" limited in the ability to interact appropriately with the general public,
in the ability to accept instructions and respond appropriately to criticism from
supervisors, and in the ability to get along with coworkers without distracting them
or exhibiting behavioral extremes (Tr. 333).  As already discussed, the ALJ's stated
reason for giving "little weight" to Dr. Schmechel's opinion is that he misconstrued

---

[27] In discussing whether Plaintiff's bipolar disorder met the requirements of a
listing for disability, the ALJ also mentioned that Plaintiff "repeatedly admitted to her
treating sources . . . that she has improved significantly on her medication" and "has
reported . . . that she takes daily walks and socializes with her neighbor" (Tr. 20).

[28] The record shows, however, that Plaintiff displayed only "marginal" or
"unsatisfactory" social and interpersonal skills while attending classes at Goodwill
during 2007 (Tr. 228, 235, 241, 251, 258), and Ms. Bowen testified that Plaintiff has
problems getting along with other people (Tr. 59).  As noted previously, the ALJ
misread the records from Goodwill Industries and dismissed Ms. Bowen's opinion as
being inconsistent with Plaintiff's recent medical records.

her assessment of Plaintiff's mental RFC as including consideration of impairments caused by a substance abuse disorder.

Dr. Sood and Mr. Nelson indicated that Plaintiff is "markedly limited" and would do poorly at work in relating to co-workers, dealing with the public, and interacting with supervisors (Tr. 402-03, 407). Ms. Berry agreed with her colleagues that Plaintiff has "marked" limitations in maintaining social functioning (Tr. 483) and she gave Plaintiff ratings of "poor or none" in being able to work in coordination with or proximity to others without being unduly distracted, to accept instructions and respond appropriately to criticism from supervisors, to get along with co-workers or peers without unduly distracting them or exhibiting behavioral extremes, to interact appropriately with the general public, and to maintain socially appropriate behavior (Tr. 485-86). The ALJ's stated reasons for rejecting these opinions also have been discussed previously. Basically, he found them to be inconsistent with Plaintiff's daily activities (*e.g.*, caring for her grandchildren and attending classes at Goodwill) and statements in her treatment records.

As with the previous RFC finding, I conclude there is not substantial evidence in the record as a whole to support the ALJ's assessment that Plaintiff "can interact with and relate to others" (Tr. 21).

### 4. Plaintiff's Ability to Adapt to Changes in the Workplace

Finally, the ALJ found that Plaintiff "can adapt to usual changes in the work setting" and "can adhere to safety rules" (Tr. 21). Plaintiff takes exception to the first finding, which again was not explained by the ALJ and is inconsistent with opinions obtained from the staff at Mid-Plains Center. Dr. Sood and Mr. Nelson opined that Plaintiff would be "markedly limited" in responding appropriately to changes in the work setting (Tr. 404), and Ms. Berry agreed by rating Plaintiff's skills as "poor to none" in this area (Tr.485).

Dr. Schmechel, however, provided a medical opinion on August 1, 2007, that Plaintiff is "not significantly limited" in the ability to respond appropriately to changes in the work setting (Tr. 333). This opinion was affirmed by Jennifer Bruning Brown, Ph.D., on January 7, 2008 (Tr. 378). Although the ALJ did not purport to rely on these opinions from the state agency psychologists, they provide substantial support for the ALJ's finding.

"The opinions of non-treating practitioners who have attempted to evaluate the claimant without examination do not normally constitute substantial evidence on the record as a whole." *Shontos v. Barnhart*, 328 F.3d 418, 427 (8th Cir. 2003) (citing *Jenkins v. Apfel*, 196 F.3d 922, 925 (8th Cir. 1999)). However, "[w]hen faced with a conclusory opinion by a treating physician, the Commissioner need only come forth with 'some medical evidence' that the claimant can work. Residual functional capacity assessments by non-treating physicians can constitute the requisite substantial evidence." *Smallwood v. Chater*, 65 F.3d 87, 89 (8th Cir. 1995) (citation omitted).

Dr. Sood's opinion that Plaintiff cannot adapt appropriately to changes in the work setting was conclusory and, apart from the concurring opinions of Mr. Nelson and Ms. Berry, lacks evidentiary support. When asked to list any clinical findings that supported this and other assessments regarding Plaintiff's ability to adjust to a job, Dr. Sood merely wrote: "History of Severe Mood d/o and its complications for many years" (Tr. 446). While there is some evidence in the record that Plaintiff does not react well to changes in her routine, I cannot say the ALJ erred in finding that she would be able to cope with usual changes in the workplace. *See, e.g., Hurd*, 621 F.3d at 739 (treating psychiatrist's opinion "offered little more than a conclusory statement that was unsupported by medical evidence" regarding claimant's ability to function in the workplace).

-47-

### 5. *Effectiveness of Plaintiff's Medications*

The Commissioner asserts in his brief that "the treatment notes establish that Plaintiff's symptoms were effectively treated with medications" (filing 22 at 16).  He states that "[f]rom March 2009 through the end of the relevant time period . . . , Plaintiff reported no serious symptoms" and she "enjoyed shorter periods of relief from symptoms in 2007 and 2008, interrupted by extraordinary life stressors[29] and medication noncompliance" (filing 22 at 16).

"If an impairment can be controlled by treatment or medication, it cannot be considered disabling." *Brace v. Astrue*, 578 F.3d 882, 885-86 (8th Cir. 2009) (holding ALJ was justified in finding that claimant's bipolar disorder was "controlled or controllable by medication," and that any lapses in his mental condition were "mainly if not entirely" due to noncompliance with his prescribed treatment, for which there was "no good excuse") (quoting *Brown v. Barnhart*, 390 F.3d 535, 540 (8th Cir. 2004)).  *See* 20 C.F.R. §§ 404.1530(b), 416.930(b) ("If you do not follow the prescribed treatment without a good reason, we will not find you disabled . . .."). In cases involving mental disorders, however, the Eighth Circuit has held that the disorder itself may excuse noncompliance and it has required the Commissioner to consider medical evidence on this issue.  *See* *Pate-Fires v. Astrue*, 564 F.3d 935, 945-46 (8th Cir. 2009) ("[W]hile there may be substantial evidence to support the ALJ's finding Pate-Fires knew she needed to take her medication, this evidence does not resolve the relevant question here: whether her failure or even refusal to follow the prescribed treatment was a manifestation of her schizoaffective or bipolar disorder. In this regard, there is no medical evidence, *i.e.*, a discussion by a doctor or other professional, which indicates Pate-Fires's noncompliance at any time was a result of

---

[29] The Commissioner cites *Donahoo v. Apfel*, 241 F.3d 1033, 1039-40 (8th Cir. 2001) for the proposition that "situational depression is not disabling" (filing 22 at 14), but there is no medical evidence that Plaintiff was ever diagnosed with situational depression.

something other than her mental illness."); *Watkins v. Astrue*, 414 Fed.Appx. 894, 896-897, 2011 WL 1166744, at *1 (8th Cir. 2011) ("[T]his court has recognized that a mentally ill claimant's noncompliance can be, and ordinarily is, the result of the mental impairment, and thus it is not deemed willful or unjustifiable. . . . Because the ALJ relied primarily on Watkins's noncompliance with treatment recommendations to discredit his allegedly disabling psychiatric symptoms, the ALJ's related adverse credibility determination is not entitled to deference.").

In the present case, the effectiveness of Plaintiff's medication prior to March 2009 is open to question, and it may also be argued that there were good reasons for her brief periods of noncompliance, including adverse side effects of psychotropic medication that was prescribed before Symbyax.[30] *See* SSR 96-7p, 1996 WL 374186, at *7-8 (Soc. Sec. Admin., July 2, 1996) ("[T]he adjudicator must not draw any inferences about an individual's symptoms and their functional effects from a failure to seek or pursue regular medical treatment without first considering any explanations that the individual may provide, or other information in the case record, that may explain infrequent or irregular medical visits or failure to seek medical treatment. . . . For example, . . . [t]he individual may not take prescription medication because the side effects are less tolerable than the symptoms.").

The ALJ did not examine these questions before making an adverse credibility finding.  He simply stated:

---

[30] The evidence shows that Plaintiff took the wrong dosage of Lithium during March-April 2007 after not reading or else misreading the prescription label (Tr. 241, 267), did not take her medications as prescribed in May 2007 (Tr. 228, 230), ran out of Lithium for several days in July 2008 (Tr. 422), discontinued Lithium in October 2008 because she felt it was causing her to cry, feel anxious, and have panic episodes (Tr. 417), and reduced her Trileptal intake in December 2008  because it was "making her high" (Tr. 413).  There is no evidence Plaintiff was noncompliant during 2009.

In her hearing testimony, the claimant specifically indicated that she is compliant with her medication. As late as 2008, however, the Mid-Plains Center records document the claimant stopping her medication, or increasing or decreasing her doses without prior consultation with her treating sources (see, e.g., Exhibit 17F). This inconsistency has not been clarified and it affects the claimant's credibility adversely.

(Tr. 26)

On remand, the Commissioner should carefully analyze Plaintiff's medication history and determine whether any noncompliance on her part was justified. Needless to say, the medical evidence will also need to be updated.

### C. The ALJ's "Step Four" Finding

Based on his assessment of Plaintiff's physical and mental RFC, and relying on the testimony of a vocational expert, the ALJ determined that Plaintiff is not disabled because she can perform her past work as a sales attendant, pizza delivery person, and highway maintenance flagger (Tr. 29-30). Because I have found that the ALJ erred in assessing Plaintiff's mental RFC,[31] this determination will be reversed and the case remanded for further proceedings.

---

[31] Specifically, I have found there is not substantial evidence in the record as a whole to support the ALJ's findings that Plaintiff's bipolar disorder does not interfere with her abilities to "maintain concentration, attention, persistence and pace" and to "interact with and relate to others" in a workplace setting (Tr. 21).

### *III. Conclusion*

For the reasons explained above, I find that the ALJ's decision is not supported by substantial evidence on the record as a whole.  Accordingly,

IT IS ORDERED that the decision of the Commissioner is reversed pursuant to sentence four of 42 U.S.C. § 405(g) and the case remanded for further proceedings consistent with this opinion.  Final judgment will be entered by separate document.

November 14, 2011.                    BY THE COURT:

                                      *Richard G. Kopf*
                                      United States District Judge

---

*This opinion may contain hyperlinks to other documents or Web sites.  The U.S. District Court for the District of Nebraska does not endorse, recommend, approve, or guarantee any third parties or the services or products they provide on their Web sites.  Likewise, the court has no agreements with any of these third parties or their Web sites.  The court accepts no responsibility for the availability or functionality of any hyperlink.  Thus, the fact that a hyperlink ceases to work or directs the user to some other site does not affect the opinion of the court.